## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IXMATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 14-cv-6993 |
| | ) | |
| SWITCH BULB COMPANY, INC., a/k/a | ) | |
| SWITCH LIGHTING CO. and WELLS | ) | |
| FARGO BANK, N.A., | ) | Judge John Z. Lee |
| | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Ixmation, Inc., ("Ixmation") and Defendant Switch Bulb Company, Inc. ("Switch") entered into an agreement whereby Ixmation agreed to manufacture a custom automated system for Switch. To secure payment, Switch obtained a Letter of Credit, which had an expiration date of October 1, 2014, from Wells Fargo Bank, N.A., issued for Ixmation's benefit. However, before Ixmation could complete its work and collect fully on the Letter of Credit, Switch told Ixmation to halt work on the project and later executed an assignment for the benefit of creditors under California law. In response, Ixmation commenced an arbitration proceeding against Switch in April of this year and, worried that the Letter of Credit would expire, filed this suit and a motion for temporary restraining order in September, requesting that the Court maintain the status quo until the arbitration is concluded.

Granting Ixmation's motion, the Court previously issued a temporary restraining order placing an equitable lien on the Letter of Credit to maintain the status quo pending the arbitration. The Letter of Credit has since expired by its terms, but the equitable lien was extended over the funds that Switch previously had deposited with Wells Fargo to secure the

1

Letter of Credit. Ixmation now moves for issuance of a preliminary injunction to maintain the equitable lien over the funds. Switch opposes Ixmation's motion, arguing that this Court lacks authority to enter the injunctive relief Ixmation requests, that Ixmation has not met the requirements for an equitable lien, and that Ixmation has not met its burden to obtain preliminary injunctive relief.[1] For the reasons discussed below, the Court concludes that Ixmation has failed to meet its burden to obtain a preliminary injunction, and its motion is denied.

## I. Factual and Procedural Background

### A.     The Proposal, Production, and Breach

Ixmation builds and sells production machinery and automated systems. Switch designs, manufactures, and sells various LED lighting solutions. Switch and Ixmation entered into a contract (the "Proposal") on July 12, 2013, for the manufacture of a custom automation system. *See* Am. Compl. ¶ 4; *id.* Ex. A. By the terms of the Proposal, Ixmation agreed to design and build the custom automation system for Switch in return for $3,908,000.00, and Switch issued a purchase order for the automation system. *See id.* ¶ 6; *id.* Ex. B. The Proposal required Switch to pay Ixmation in increments contingent on Ixmation's successful completion of certain milestones. *See id.* ¶ 8; *id.* Ex. A. The Proposal's Appendix, documenting Ixmation's terms and conditions of sale, contained an arbitration provision requiring the parties to arbitrate, *inter alia,* breach of contract claims. *Id.* Ex. A, Appendix I, ¶ 19. The arbitration provision also required that any disputes regarding the Proposal would be governed by Illinois law. *Id.*

---

[1] Switch concurrently moves to dismiss this lawsuit or in the alternative moves to stay the case and compel arbitration. *See generally* Def.'s Mot. Dismiss, or in Alt. Compel Arb. The Court has set a status hearing for November 3, 2014, at which time it will take up Switch's motion. Additionally, two clean technology venture capital investment firms which are part of Switch's assignment for benefit of creditors in California have moved to intervene in the proceedings here. *See generally* Intervenors' Mot. Interv. Similarly, the Court will continue this motion and defer its consideration until the November 3, 2014 hearing.

Throughout the months following the Proposal and purchase order, the parties agreed to several change orders. Of particular relevance is a November 2013 change order that resulted in a credit of $573,670.00 to Switch and delayed the project delivery schedule by seven to nine weeks. *See* Pl's Mot. Prel. Inj., Curtis Aff. ¶ 7. This delay was, at least partly, due to Switch unilaterally putting the project on hold for several weeks. *Id.* Switch later acknowledged in a February 28, 2014, email that the November 2013 change order's revised delivery schedule meant Factory Assurance Testing ("FAT"), a production milestone stage, would not occur until the week of March 31, 2014. *Id.* ¶ 8; *see also id.* Ex. 2. In this email, Switch documented a detailed schedule for finishing production of the machine from the FAT stage of production through shipping and delivery in late April. *See id.* Ex. 2.

In August 2013, Ixmation requested a Letter of Credit from Switch to secure payment for the custom automation system. On August 5, 2013, Wells Fargo issued the Letter of Credit in the amount of $3,079,200.00. *See* Am. Compl. Ex. D. The Letter of Credit had an expiration date of September 1, 2014. *See id.* On November 25, 2013, at the request of Ixmation, the amount in the Letter of Credit was reduced to $2,858,194.50, and the expiration date was extended to October 1, 2014. *See id.* Ex. E. As Ixmation made progress on the manufacture of the custom automation system, it drew on the Letter of Credit. The first draw occurred in October 2013 and the second in January 2014, with the draws totaling $1,836,097.80. *See id.* ¶ 11. The first draw was authorized after Ixmation completed its mechanical design review stage of production. *See* Pl.'s Mot. Prelim. Inj., Ludwig Aff. ¶ 7. The second draw was authorized after Ixmation completed a sub-system debug of the custom automation system. *See id.* ¶ 8. Consequently, $1,022,096.70 remained in the Letter of Credit. *See* Am. Compl. ¶ 11.

Ixmation would make no further draws. By early spring, a dispute between the parties arose. In March 2014, Ixmation was working on the FAT stage of production. During this time, Ixmation became concerned with Switch's actions and communications. On March 18, 2014, Ixmation's Senior Account Manager Randy Curtis met with Switch's Project Manager Myron Moreno in San Jose, California, to continue discussions of FAT. *See* Pl.'s Mot. Prel. Inj., Randy Curtis Aff. ¶ 9. During this meeting, Moreno told Curtis that VantagePoint Capital, a venture capital firm that funded Switch, had laid off more than half of Switch's employees, including employees who were working on the custom automation system and necessary to complete the FAT stage of production. *See id.* Despite this, Moreno indicated he would be coming to Ixmation's place of business in Roselle, Illinois, at the end of March for FAT. *See id.* The following day, however, on March 19, 2014, Moreno told Curtis that Switch was "trending towards liquidation" and would not be able to provide parts and personnel necessary for Ixmation to complete FAT. *See id.* ¶ 10. These representations were confirmed on March 20, 2014, in an email from Moreno to Curtis. *See id.* ¶ 11; *see also* Am. Compl. Ex. G.

The parties continued communications through the end of March 2014. *See* Pl.'s Mot. Prel. Inj., Curtis Aff. ¶¶ 12–13. For its part, Switch asserts that it was Ixmation that unilaterally ceased work on the custom automation system before reaching additional production milestones that were necessary to draw additional funds from the Letter of Credit. *See* Def.'s Mem. Opp. 2. An exchange of letters in late March captured the state of the parties' business relationship. By letter on March 27, 2014, Switch's Executive Vice President Ronald Rudolph notified Ixmation that on March 24, 2014, Switch had requested that Ixmation stop work on the custom automation system and that further financial assurances from Switch were not forthcoming because "[I]xmation insisted from the beginning that the full cost of the [custom automation system] be

deposited into a bank under letter of credit with funds to be released upon [I]xmation's appropriate performance." *See* Pl.'s Mot. Prelim. Inj., Ludwig Aff. ¶ 11; *id.* Ex. 1. Ixmation's President Mick Macsek promptly responded to Switch on March 28, 2014, writing that it appeared the parties were in a contractual dispute and quoting a provision of the Proposal requiring the parties to put forth best efforts to resolve disputes. *See id.*; *id.* Ex. 2. Macsek's letter served as Ixmation's formal request for a meeting of the companies' senior executives. *See id.* Ex. 2.

Ixmation, now cognizant of an impending breakdown in the parties' relationship and Switch's apparently precarious financial state, sent four senior executives to attend the meeting on April 3, 2014, in San Jose, California. Pl.'s Mot. Prelim. Inj., Ludwig Aff. ¶ 12. According to Ixmation, this meeting proved fruitless; Switch provided no answers to questions concerning the reason for Switch's suspension of operations and apparent skeleton crew, and no satisfactory plan on how Switch intended to supply the parts and personnel necessary for Ixmation to perform FAT. *See* Pl.'s Mot. Prel. Inj., Curtis Aff. ¶¶ 12, 14.

### B.     Arbitration and Assignment for the Benefit of Creditors

Faced with its rapidly deteriorating business relationship with Switch, Ixmation filed for American Arbitration Association ("AAA") arbitration on April 16, 2014. *See* Amend. Compl. ¶ 19. The timeline of arbitration thereafter becomes hazy. Each party insists that, after the April 16, 2014, filing by Ixmation, it was the other party that delayed further progress in the arbitration. Ixmation represented to the Court at the October 20, 2014 hearing that, after it had filed for AAA arbitration, it did not move to expedite the process or take any other actions to advance the arbitration in the hope that Switch would eventually agree to resolve their dispute.

Switch insists that is was Ixmation who delayed the arbitration. *See generally* Def.'s Second Supp. Mem. Opp'n. Pl.'s Mot. TRO 10–11.

Regardless, the next significant action in the arbitration proceedings was an email sent to Ixmation by Kelly Turner of the AAA on May 6, 2014. In the email, Turner informed Ixmation that it had to pay an administration fee by July 17, 2014, before the AAA would appoint an arbitrator so that the arbitration could proceed. *See* Pl.'s Supp. Memo. Ex. 2. The AAA required this "proceed fee" because Ixmation had chosen to file its request for arbitration under a flexible fee schedule. *See id.* The email notice also imposed a deadline of May 20, 2014, for Switch to file an answer, counterclaim, or objection to Ixmation's request to hold the arbitration in Chicago. *See id.*

A little less than one month after this email was sent, on May 30, 2014, Switch instituted an assignment for the benefit of creditors under California law.[2] *See id.* Ex. 4. While Switch apparently informed the AAA of this assignment by email on June 30, 2014, *see id.*, Ixmation did not receive notice of Switch's assignment until the AAA sent an email to Ixmation on July 9, 2014. *See id.* Ex. 5. By this point, Ixmation still had not paid the required proceed fee to begin arbitration. The next week, on July 15, 2014, Ixmation finally paid the fee, requested that the arbitration proceed without Switch, and for the first time requested expedited briefing. *See id.* Ex. 6.

Thereafter a series of email communications occurred between Switch, Kelly Turner, and Ixmation. *See generally id.* Ex. 7. Turner contacted the parties, attempting to schedule an administrative conference call for the final weeks of July. *See id.* 7/16/14 Email from Kelly

---

[2] An assignment for the benefit of creditors is a state-level equivalent to a bankruptcy proceeding. *See* Pl.'s Supp. Mem. Ex. 4 (6/30/14 email from Switch to the AAA) ("An [assignment for the benefit of creditors] is a state level insolvency proceeding undertaken under state law, in this case California[.]").

Turner to Switch and Ixmation. Ixmation replied on July 16, 2014, asking to schedule the administrative conference call for July 21 or July 22. *See id.* 7/16/14 Email from Ixmation to Kelly Turner. Turner then suggested a date of July 22, 2014. *See id.* 7/16/14 Email from Kelly Turner to Switch and Ixmation. Switch responded, indicating that week would not work for it. *See id.* 7/16/14 Email from Switch to Kelly Turner and Ixmation. The next day, Switch proposed a July 28 or July 29 date. *See id.* 7/17/14 Email from Switch to Kelly Turner and Ixmation. Thereafter Switch noted that it still was retaining counsel, that it needed to find counsel that could appear in Illinois, and that this process would take two to three weeks. *See id.* 7/29/14 Email from Switch to Kelly Turner and Ixmation. In an attempt to balance Switch's need to find appropriate counsel with the need to avoid undue delay, Turner scheduled the conference call for August 15, 2014. *See id.* 7/29/14 email from Kelly Turner to Switch and Ixmation.

After Switch retained counsel, it determined it would contest the Chicago locale requested by Ixmation. *See id.* Ex. 9. The AAA set a deadline of August 29, 2014, for both sides to submit briefing supporting its requested choice of locale. *See id.* Ex. 9. August 29 also served as the deadline by which Switch was required to indicate whether it woiuld agree to a single arbitrator instead of the three-arbitrator panel. *See id.* On September 3, 2104, the AAA decided in favor of Ixmation and determined that the arbitration would take place in Chicago. *See id.* Ex. 11. The AAA set a deadline of September 17, 2014, for the parties to submit a list of potential arbitrators. *See id.* On October 3, 2014, the AAA appointed Randall Rapp as an arbitrator. *See* Def.'s Mot. Dismiss or Alt. Compel., Ex. A. On October 6, 2014, Switch indicated that it would prefer a panel of three arbitrators. *See id.* Ex. B. Switch's request is the

last activity reflected in the record. From the record, it appears that Ixmation never raised any concern about the expiration of the Letter of Credit with the AAA.

### C. Procedural History of This Action

Ixmation filed a complaint and moved for a temporary restraining order ("TRO") in the Circuit Court for Cook County, Illinois, on September 5, 2014. *See* Def.'s Notice Remov. ¶ 1; *id.* Ex. A. Switch removed the case to this Court based on diversity jurisdiction on September 9, 2014. *See* Def.'s Notice Remov. ¶ 2. Ixmation refiled its request for a TRO on September 10, 2014. *See* Pl.'s Mot. TRO. This Court held a hearing on Ixmation's motion for a TRO on September 17, 2014. The Court set a briefing schedule, allowing Wells Fargo to file a response to Ixmation's motion for a TRO and allowing Switch to file supplemental briefing opposing Ixmation's motion on state law grounds.³ *See* 9/17/14 Min. Entry. The Court also encouraged the parties to explore settlement. *See id.*

The Court held another hearing on September 23, 2014. The Court noted that Switch's supplemental briefing did not address the state law issues the Court requested, but rather reargued points Switch had already raised in its original response brief. *See* 9/23/14 Min. Entry. Rather than strike Switch's brief, the Court granted Ixmation a one-day extension to file a brief replying to both Switch and Wells Fargo's briefing. *See id.* The Court reset the hearing on Ixmation's motion for TRO, originally set for September 24, 2014, to September 26, 2014. *See id.*

---

³    The Court also denied an earlier motion to dismiss filed by Switch arguing principally that the arbitration provision in the parties' contracted precluded this Court from intervening in the parties' dispute. The Court found Switch's argument unpersuasive in light of Seventh Circuit precedent holding that a court can enter injunctive relief preserving the status quo and the meaningfulness of arbitration. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Salvano*, 999 F.2d 211, 215 (7th Cir. 1993).

On September 26, 2014, the Court held a hearing on Ixmation's motion for TRO. The Court first granted Ixmation's request to submit an amended complaint. *See* 9/26/14 Min. Entry. The Court then directed the parties to file supplemental briefing addressing the procedural history before the AAA. *See id.* The Court continued the hearing on Ixmation's motion for TRO to September 30, 2014, at 12:30 pm. *See id.*

On September 30, 2014, the Court reconvened for a hearing on Ixmation's motion for TRO. First, the Court addressed whether Wells Fargo should remain in the case. Ixmation asserted no claims against Wells Fargo and represented on the record at the September 26, 2014, hearing that it had no claims against Wells Fargo. *See generally* 9/30/14 Hr'g Tr. at 3, lns. 10–13. Without a claim pending against Wells Fargo, the Court dismissed Wells Fargo from the lawsuit and denied Ixmation's request to compel Wells Fargo to extend the Letter of Credit.[4] *See* 9/30/14 Hr'g Tr. at 3–4, lns. 10–25, 1–18.

After dismissing Wells Fargo, the Court turned to Ixmation's request for a TRO in the form an equitable lien.[5] On the record before it, the Court found that Ixmation met the

---

[4] Specifically, the Court found that Ixmation had not pleaded claims against Wells Fargo and admitted that it had no claims against Wells Fargo. The Court noted that under Federal Rule of Civil Procedure 65(d)(2), an injunctive order can only bind the parties, the parties' officers, agents, servants, employees, and attorneys, and other persons in active concert or participation. *See* Fed. R. Civ. P. 65(d)(2). A person is in "active concert or participation" if they "aid and abet" the enjoined party or if they are in "privity" with the joined party. *Blockowicz v. Williams*, 630 F.3d 563, 567 (7th Cir. 2010). Ixmation bore the burden of proving that any third party it sought injunctive relief as to was within the scope of the injunction it sought to enter. *Id.* Ixmation had not met that burden because it failed to advance evidence that Wells Fargo acted in concert with Switch, was an agent of Switch, or was in privity with Switch. Furthermore, while the Court noted it could issue an injunction against a nonparty in order to preserve its ability to render judgment, see *Herrlein v. Kanakis*, 526 F.2d 252, 255 (7th Cir. 1975), the Court, mindful of its independent duty to ensure injunctions are appropriate in scope, see *Chicago Board of Education v. Substance, Inc.*, 354 F.3d 624, 631–32 (7th Cir. 2003), declined to enter an injunction against Wells Fargo as a nonparty in this case.

[5] Switch mischaracterizes the equitable lien imposed by the Court as a *sua sponte* form of relief not requested by Ixmation. Ixmation, however, proposed the equitable lien in its moving papers. *See* Pl.'s Supp. Mem. 9 (noting that preserving the status quo would be by equitable lien if a draw were ordered on the Letter of Credit and the proceeds held in escrow or trust).

requirements for an emergency TRO and imposed an equitable lien on the Letter of Credit. The Court additionally held that, once the Letter of Credit expired by its own terms, the equitable lien would extend to that portion of the funds that Switch previously had deposited with Wells Fargo as collateral for the Letter of Credit sufficient to cover the balance that remained under the Letter of Credit. *See* 9/30/14 Hr'g Tr. at 9. Any additional amounts would be released to Switch. *See id.* The Court then scheduled a briefing schedule for Ixmation's motion for preliminary injunction and set a hearing on the motion for October 14, 2014 at 4:30 p.m. *See* 9/30/14 Min. Entry. The Court also required Ixmation to post a bond in the amount of $10,000.00. *See id.*

Subsequently, on October 7, 2014, Switch requested an emergency extension of time to file its response to Ixmation's motion for preliminary injunction. *See* Def.'s Mot. Ext. Time. The Court held a hearing on October 8, 2014, and granted the motion based upon Switch's agreement to be bound by the TRO until October 20, 2014. *See* 10/8/14 Min. Entry.[6]

Switch subsequently filed a motion to dismiss or in the alternative compel arbitration and also requested leave to file an over-length response brief under Local Rule 7.1 to Ixmation's motion for preliminary injunction. The Court granted Switch's request and gave Ixmation two additional days to submit its reply brief. *See* 10/14/14 Min. Entry. The Court continued Switch's motion and set it for hearing concurrent with Ixmation's motion for preliminary injunction. *See id.*

On October 20, 2014, the Court heard argument on Ixmation's request for preliminary relief. The Court also heard brief argument from two venture capital firms, VantagePoint

---

[6] At the parties' request, the Court also held a telephone conference on October 9, 2014. During the telephone conference, the parties represented that Wells Fargo did not wish to maintain the funds constituting the collateral for the Letter of Credit. *See* 10/9/14 Min. Entry. Switch proposed that the funds be placed in a separate account in another financial institution and agreed that the transfer would not alter the effect of the equitable lien over those funds. *See id.* The Court approved this request. *See id.*

Cleantech Partners II, L.P., VantagePoint Venture Partners 2006 (Q), L.P. on their motion to intervene filed on October 18, 2014. After argument, the Court took the matter under advisement. That same day, the Court denied Ixmation's motion. *See* 10/20/14 Min. Entry. This Memorandum Opinion and Order sets forth the reasoning for the Court's denial.

## II. The Court's Authority to Issue Injunctive Relief

As an initial matter, Switch contests the Court's authority to grant the equitable relief previously granted to Ixmation. Specifically, Switch cites to *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999) for the proposition that this Court cannot impose an injunction hindering Switch's ability to transfer or otherwise use its assets as it sees fits. In Switch's view, such an injunction would be nothing more than a prohibited prejudgment attachment. But *Grupo Mexicano* is distinguishable in two material respects. First, *Grupo Mexicano* involved a breach of contract action seeking only money damages. *See Grupo Mexicano*, 527 U.S. at 310 (focusing the question presented in the context of "an action for money damages"); *see also Oak Leaf Outdoors, Inc. v. Double Dragon Int'l, Inc.*, 812 F. Supp. 2d 944, 946 (C.D. Ill. 2011) (noting that *Grupo Mexicano* determined that in a suit for money damages on a contractual breach theory such injunctive relief freezing assets pre-judgment was "historically unavailable from a court of equity"). Here, although Ixmation is seeking money damages in arbitration, it is seeking only equitable relief from this Court to preserve the status quo so that any judgment it may receive from the arbitration panel would be meaningful. *See Salvano*, 999 F.2d at 215 (district court has authority "to maintain the status quo without prejudice to the merits of any of the parties' claims or defenses until an arbitration panel [can] consider the issues presented").

Furthermore, even after *Grupo Mexicano*, courts have recognized a district court's authority to enter equitable relief preserving assets where there is a "nexus between the assets sought to be frozen through an interim order and the ultimate relief requested in the lawsuit." *U.S. ex rel. Rahman v. Oncology Associates,* 198 F.3d 489, 496–97 (4th Cir. 1999). Here, a nexus plainly exists between the Letter of Credit, which Switch had arranged with Wells Fargo for Ixmation's benefit to secure payment under the agreement and Ixmation's claim. Indeed, Switch itself admitted in its email communications that the Letter of Credit served to cover exactly the production of the custom automation system by Ixmation that is the subject of Ixmation's claim. Accordingly, the reasoning in *Grupo Mexicano* did not apply in this case while the Letter of Credit was in effect, and the Court had the authority to preserve the status quo by imposing an equitable lien over it and the funds that could be drawn from it.[7]

That said, whether the equitable lien would extend to the funds that Switch had deposited with Wells Fargo as collateral for the Letter of Credit upon the expiration of the Letter of Credit itself presents an interesting, and previously undecided, question of law.[8] But the

---

[7] Contrary to Switch's contention, *Grupo Mexicano* also does not "overrule" *American Hospital Supply Corp. v. Hospital Products Ltd.*, 780 F.2d 589 (7th Cir. 1986). As *Oak Leaf* observes, the Seventh Circuit's holding in *American Hospital Supply Corp.* did not consider the key issue in *Grupo Mexicano*, that is, "whether a district court has the authority to enter a preliminary injunction when the requesting party seeks only money damages for breach of contract." *Oak Leaf Outdoors*, 812 F. Supp. 2d at 948 (emphasis added). Moreover, this Court relied on *American Hospital Supply Corp.* for the proposition that a plaintiff faced with an imminently insolvent defendant suffers irreparable harm. The Court did not invoke *American Hospital Supply Corp.*, as Switch appears to suggest, for the general proposition that an equitable lien is available to Ixmation. Furthermore, it is well-established that a letter of credit and its associated funds does not become part of the bankruptcy estate of the debtor. *See In re Duplitronics, Inc.*, 183 B.R. 1010, 1015 (Bankr. N.D. Ill. 1995).

[8] Under Illinois law an equitable lien requires "(1) a debt, duty or obligation owing by one person to another, and (2) a *res* to which that obligation fastens." *Jacobsen v. Conlon,* 302 N.E.2d 471, 473 (Ill. App. Ct. 1973). In the proper circumstances, "[i]f the *res* to which the lien attaches is converted into money, the Court in a proper case will treat the money as substituted for the property." *In re Brass Kettle Rest., Inc.*, 790 F.2d 574, 575 (7th Cir. 1986) (quoting *Marshall Savings & Loan Ass. v. Chi. Nat. Bank,* 206 N.E.2d 117, 120 (Ill. App. Ct. 1965)).

Court need not address this question here, because it finds, after consideration of the parties' papers, that Ixmation has failed to demonstration that a preliminary injunction is appropriate.

### III. Ixmation's Request for Preliminary Injunction

#### A. Legal Standard

Ixmation moves for a preliminary injunction maintaining the TRO. "[A] preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the USA, Inc.,* 549 F.3d 1079, 1085 (7th Cir. 2008) (internal citations and quotations omitted). The moving party must make a clear showing that it is entitled to the relief it seeks. *Goodman v. Ill. Dep't of Fin. & Prof'l Regulation,* 430 F.3d 432, 437 (7th Cir. 2005). A party seeking a preliminary injunction must show that (1) it is reasonably likely to succeed on the merits; (2) no adequate remedy at law exists; (3) it will suffer irreparable harm which, absent injunctive relief, outweighs the irreparable harm the respondent will suffer if the injunction is granted; and (4) the injunction will not harm the public interest. *Joelner v. Vill. of Wash. Park, Ill.*, 378 F.3d 613, 619 (7th Cir. 2004). Analysis of these elements occurs in two phases: a threshold phase and a balancing phase. *See Girl Scouts of Manitou Council,* 549 F.3d at 1085–86.

"To survive the threshold phase, a party seeking a preliminary injunction must satisfy three requirements." *Id.* at 1086. First, the party must show that it will suffer irreparable harm without the injunction. Second, the party must demonstrate that traditional legal remedies would be inadequate. Third, the party must establish that its claim has some likelihood of succeeding on the merits. If the party cannot make a showing as to *each* of these threshold requirements, the preliminary injunction must be denied. *Id.* If, however, the party meets this initial threshold, the Court will proceed to the balancing phase of the analysis. *Id.*

In the balancing phase, the party seeking the injunction must demonstrate that its harm in the absence of such relief outweighs any harm that may be suffered by the non-moving party if the injunction is granted. *Id.* In making this determination, the Court employs a sliding scale approach: "[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor, the less likely he is to win, the more need it weigh in his favor." *Id.* (quoting *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 389 (7th Cir. 1984)). Additionally, where appropriate, this balancing process "should . . . encompass any effects that granting or denying the preliminary injunction would have on nonparties (something courts have termed the "public interest")." *Id.* (quoting *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001)). Taking into account all of these considerations, the Court must exercise its discretion "to arrive at a decision based on a subjective evaluation of the import of the various factors and a personal, intuitive sense about the nature of the case." *Id.* (internal citations and quotations omitted).

## B. Ixmation Has Failed to Show Irreparable Harm

On a fuller record and with more developed argument, the Court finds that Ixmation's unwarranted delay in seeking this injunction belies its contention of irreparable harm and defeats its motion for preliminary injunction. Delay is a factor in assessing the existence of irreparable harm, *Ideal Industries, Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1025 (7th Cir. 1979), and unexcused delay on the part of parties seeking extraordinary injunctive relief is grounds for denial of a motion "because such delay implies a lack of urgency and irreparable harm." *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005). "[T]he likelihood of irreparable harm takes into account how urgent the need for equitable relief really is." *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 788 (7th Cir. 2011). This is particularly true where the party seeking injunctive relief has "knowledge of the pending nature of the alleged irreparable harm."

14

*Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, Case No. CV 14-820 (BAH), --- F. Supp. 2d ----, 2014 WL 2758603, at *3 (D.D.C. June 18, 2014) (citing *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975)). Numerous courts in this district have refused to issue preliminary injunctions on this ground. *See, e.g.*, *Johnson Publ'g, Co., Inc. v. Willitts Designs Int'l, Inc.,* No. 98 C 2653, 1998 WL 341618, at *8 (N.D.Ill. June 22, 1998) (presumption of irreparable harm weak where the plaintiff waited four months to request injunctive relief); *Stokley–Van Camp, Inc. v. Coca–Cola Co.,* No. 86 C 6159, 1987 WL 6300, at *3 (N.D.Ill. Jan. 30, 1987) (denying "extraordinary remedy" of preliminary injunction despite presumption of irreparable harm because plaintiff waited three months before filing action and the defendant was spending substantial amounts to market its product).

Here, although Ixmation initiated the arbitration on April 16, 2014, it did not pay the proceed fee required by AAA until almost three months later, on July 15, 2014. At a minimum, Ixmation received notice of the required proceed fee on May 6, 2014. And although Ixmation did not know that Switch had executed an assignment for the benefit of creditors until early July, Ixmation became aware of Switch's precarious financial state in March 2014. Perhaps more importantly, Ixmation knew in no uncertain terms that the Letter of Credit would expire on October 1, 2014. Yet, Ixmation did not seek to expedite the AAA proceedings until July 16, 2014. And, when it did, it only did so in a one-line request that the AAA "select an arbiter and hearing date on an expedited schedule." *See* Pl.'s Supp. Mem., Ex. 6. After this request, Ixmation never made another request to expedite the appointment of the arbitrators or otherwise hasten the proceeding, and it never raised any concern about the expiration of the Letter of Credit with the AAA.

Instead, Ixmation waited until September 5, 2014, to file a request in state court seeking a TRO to preserve that expiration of the Letter of Credit. This was less than one month before the expiration date and nearly four and a half months after Ixmation first filed for arbitration. When asked to explain the delay, Ixmation's counsel stated during the preliminary injunction hearing that Ixmation had waited until September in the hope that the parties would be able to come to an amicable resolution rather than proceeding with litigation. But, this strategy was at its own risk and its peril. "Although delay may not preclude the grant of ultimate relief, it may preclude preliminary relief because it undermines the sense of urgency that typically accompanies a motion for preliminary injunction." *Silber v. Barbara's Bakery, Inc.*, 950 F. Supp. 2d 432, 441 (E.D.N.Y. 2013) (finding five-month delay in moving for preliminary injunction defeated a finding of irreparable harm).

To be clear, the Court's conclusion that Ixmation's delay precludes preliminary relief does not absolve Switch of blame. On the record before the Court, it appears Switch may have been less than forthright with Ixmation regarding its financial condition in March 2014, failed to communicate its assignment for the benefit of creditors to Ixmation in a timely fashion, and used the procedural devices available to it to prolong the arbitration proceedings, such as challenging the location of the arbitration and insisting upon the appointment of three arbitrators. But, Ixmation should have done its part to expedite the arbitration in light of the Letter of Credit's October 1 expiration date. It did not do so. "It is horn-book law . . . that a person who seeks the protection of equity must do equity." *In re Thomas*, 204 F.2d 788, 794 (7th Cir. 1953). The Court finds that Ixmation's failure to seek an expeditious resolution of the arbitration proceeding and delay in seeking relief from the Court, despites its full knowledge of the pending October 1

deadline and reason to doubt Switch's continuing financial health, fatally undermines its ability to demonstrate the existence of irreparable harm. For this reason, Ixmation's motion is denied.

## IV. Conclusion

For the reasons stated herein, Ixmation's Motion for Preliminary Injunction [36] is denied.

**ENTERED: 10/23/14**

**Hon. John Z. Lee**
**United States District Judge**